FILED
AUSTIN DIVISION

2002 NO -7 AM 10: 29

WESTERN DISTRICT OF TEXAS
U.S. CLERK'S OFFICE

BY:_____
DEPUTY

# UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF TEXAS, AUSTIN DIVISION

---

CHRISTOPHER OCHOA,

                     Plaintiff,

           v.

CITY OF AUSTIN, TEXAS; CHIEF JAMES EVERETT, in his individual and official capacities; CAPT. BRUCE MILLS, in his individual and official capacities, SGT. BRUCE BOARDMAN, in his individual and official capacities; SGT. HECTOR POLANCO, in his individual and official capacities; ESTATE of SGT. EDWARD BALAGIA, in his individual and official capacities; and JOHN DOES 1 - 20, supervisory and other officers of the Austin Police Department, in their individual and official capacities,

                     Defendants.

No. A O2 CA 710 JN

**VERIFIED**
**COMPLAINT**
**AND**
**JURY DEMAND**

---

      Plaintiff CHRISTOPHER OCHOA, by and through his attorneys, the law firm of

COCHRAN NEUFELD & SCHECK, LLP and WILLIAM ALLISON, ESQ., hereby alleges as

follows:

1.    Plaintiff CHRISTOPHER OCHOA was imprisoned for twelve years, two months and two

days for a murder he did not commit. Mr. OCHOA was exonerated, and subsequently released

on January 16, 2001, based on DNA testing of semen and pubic hair evidence by both law

enforcement and independent labs. (The Court's April 24, 2001 Findings of Fact and

Conclusions of Law granting Mr. OCHOA's petition for habeas corpus are attached as Exhibit 1,

the DNA reports are attached as Exhibit 2, and the February 6, 2002 Order dismissing the

1

Indictment for actual innocence is attached as Exhibit 3.)

2.     Defendant law enforcement officials coerced Mr. OCHOA into "confessing" to the October 24, 1988 robbery, rape and murder of the victim, Nancy DePriest by threatening him with imminent physical injury, sexual assault in prison, and death by lethal injection. They also coerced him into implicating his friend, Richard Danziger; pleading guilty; and testifying against Mr. Danziger at his trial – although Mr. OCHOA had no involvement in or personal knowledge of these crimes. The defendants knew or should have known that Mr. OCHOA had nothing to do with this crime. They nonetheless ignored, suppressed and destroyed material exculpatory evidence, and also fabricated inculpatory evidence by providing Mr. OCHOA with crime scene details that only the perpetrator would have known.

3.     As a direct result of defendants' intentional, bad faith, willful, wanton, reckless, and/or deliberately indifferent acts and omissions, CHRISTOPHER OCHOA sustained injuries and damages, including, among others, the following: personal injuries; pain and suffering; severe mental anguish; emotional distress; loss of income; infliction of physical illness; inadequate medical care; humiliation, indignities and embarrassment; degradation; injury to reputation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational and professional opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression.

4.     Beyond compensating Mr. OCHOA for the twelve years, two months and two days stolen from him as well as his continuing injuries, this action seeks to redress the unlawful municipal policies and practices pursuant to which defendants, acting under color of law both independently

2

and in concert, violated his clearly established rights as guaranteed by the First, Fourth, Fifth,

Sixth and Fourteenth Amendments to the United States Constitution and the Constitution and

laws of the State of Texas.

## I.

## JURISDICTION

5.     Title 28 U.S.C. §§ 1331 and 1343 grant federal question jurisdiction over the claims

arising out of violations of the United States Constitution.

6.     Supplemental jurisdiction over Mr. OCHOA's pendent state law claims exists pursuant to

28 U.S.C. § 1367(a).

## II.

## VENUE

7.     Pursuant to 28 U.S.C. § 1391(b), venue is proper in the Western District of Texas, Austin

Division, the judicial district in which the claim arose and in which all defendants reside or

conduct business.

## III.

## THE PARTIES

8.     Plaintiff CHRISTOPHER OCHOA is, and at all times material to this Complaint was, a

resident of the State of Texas. He remains a citizen of Texas and resides in El Paso, Texas.

9.     Defendant CITY OF AUSTIN, TEXAS ("the City") is a municipality organized under the

laws of the State of Texas. It can be served with process through Mayor Gustavo Garcia or City

Clerk Shirley Brown at 124 West 8th Street, Austin, Texas 78701. The Austin Police

Department ("APD") is an agency of defendant CITY OF AUSTIN. The current police chief is Stan Knee.

10.     Defendant JAMES EVERETT was the Chief of the Austin Police Department during the investigation of the DePriest murder and is currently a resident of Dallas County, Texas. In that capacity he was the ultimate supervisor for the individual APD Homicide defendants and the policymaker for the APD. He is named here in both his official policymaking and individual capacities. He can be served with process at 4105 Flintridge Drive, Dallas, Texas, 75244.

11.     Defendant BRUCE MILLS was a Captain of the APD at the time of Mr. OCHOA's wrongful arrest and conviction, and is currently a resident of Austin, Travis County, Texas. He is named here in both his official and individual capacities and can be served with process at 2900 Mill Reef Cove, Austin, Texas, 78746.

12.     Defendant HECTOR POLANCO was at all times material to this Complaint an officer and/or Sergeant of the Austin Police Department. He is named here in both his official and individual capacities. He is a resident of Austin, Travis County, Texas, and can be served with process at 3801 Leadville Drive, Austin, Texas, 78749.

13.     Defendant BRUCE BOARDMAN was at all times material to this Complaint an officer and/or Sergeant of the Austin Police Department. He is named here in both his official and individual capacities. He is a resident of Austin, Travis County Texas, and can be served with process at 405 Canyon Wren, Buda, Texas, 78610.

14.     Defendant EDWARD BALAGIA, now deceased, was at all times material to this Complaint an officer and/or Sergeant of the Austin Police Department. His ESTATE is named here as a defendant for the acts taken in BALAGIA's official and individual capacities.

4

15.     Defendant JOHN DOES 1 through 20 were at all times material to this Complaint officers and supervisory officers of the Austin Police Department who participated in the acts alleged in the complaint but whose identities are not currently known to Mr. OCHOA. They are named here in both their official and individual capacities.

## IV.

## THE FACTS

### The Murder of Nancy Depriest

16.     On the morning of October 24, 1988, Nancy DePriest was working at a Pizza Hut on Reinli Street in Austin, Texas. Achim Josef Marino, disguised as a repairman, entered the store alone. He bound her hands with handcuffs, pulled her shirt and brassiere up over her head, brought her to a back room, and vaginally raped her. Marino then brought Ms. DePriest back to a restroom, where he forced her to kneel, and then shot her once in the back of the head with a .22-caliber Ruger pistol. Marino pulled Ms. DePriest out of the restroom in an unsuccessful search for the spent shell casing, and flooded the store to obliterate evidence of his crimes, including any fingerprints he might have left on the lost shell casing. Only a single pubic hair from Marino remained at the scene.

17.     Marino left Ms. DePriest for dead after removing the handcuffs and stealing a bank bag filled with cash, which he later stashed at his parents' home in El Paso. El Paso police seized the .22-caliber Ruger from Marino later in 1988, when he was arrested on another charge at an El Paso bus station.

18.     Emergency medical technicians discovered Ms. DePriest, unconscious but still alive, lying on her back with her hands behind her and her brassiere loosely around her wrists and

5

lower arms. Ms. DePriest was taken to the hospital, where medical staff employed a rectal thermometer probe to record her temperature as she awaited organ donation.

19.     Nancy DePriest died during the evening hours of October 24, 1988, the same day Achim Joseph Marino attacked her.

20.     Two days later, Travis County Medical Examiner Roberto Bayardo conducted an autopsy observed by defendant POLANCO. Bayardo initially reported that Nancy DePriest had been sexually assaulted both vaginally and anally. Yet in December 2000, years after both Mr. OCHOA and Mr. DANZIGER were convicted, new information led Bayardo to revise his opinion and conclude that Nancy DePriest was not sodomized, but that the anal and rectal injuries he had previously found to be consistent with sodomy were actually caused by the insertion of a rectal thermometer probe while she was in the hospital.

### Defendants' Abusive Custodial Interrogations of Christopher Ochoa, Coerced "Confessions," and Cover-Up

21.     APD Homicide Detectives HECTOR POLANCO, EDWARD BALAGIA and BRUCE BOARDMAN were assigned to investigate Ms. DePriest's murder and rape.

22.     Consistent with the APD Homicide Unit's custom, policy or practice POLANCO, BALAGIA and BOARDMAN intended to "close" the case as quickly as possible by using abusive and coercive tactics, in reckless disregard for the constitutional rights of their suspects and in callous and deliberate indifference to the truth.

23.     On the morning of November 11, 1988, Sgt. BRUCE BOARDMAN picked up CHRISTOPHER OCHOA at the Pizza Hut where he worked, at MLK and Guadalupe Streets in Austin, Texas, and brought him to the Austin Police Department headquarters for interrogation in

connection with the capital murder of Nancy DePriest.

24.     Defendants took Mr. OCHOA into custody for questioning based solely on the tip of a Pizza Hut employee from the Reinli Street store. The employee reported that RICHARD DANZIGER had acted suspiciously while visiting the restaurant with Mr. OCHOA after the murder, proposing a toast to the memory of Nancy DePriest and asking a security guard for details about the murder and investigation.

25.     As of November 11, 1988, CHRISTOPHER OCHOA was twenty-two years old and had never before been in police custody.

26.     Defendant POLANCO terrified Mr. OCHOA from the outset of the interrogation, warning that POLANCO's street nickname was "el cocooi," a Spanish slang term Mr. OCHOA understood to mean, "the bogeyman" or "the ghost."

27.     Mr. OCHOA insisted he had no involvement in the offense and asked for a lawyer. An unidentified Hispanic female JANE DOE officer told him he had no right to an attorney until he was charged with a crime. Although he had not waived his right to an attorney and did not wish to be questioned without the assistance of counsel, defendants did not provide him with an attorney, and continued the abusive interrogation unrelentingly throughout Friday, November 11 and Monday, November 14, 1988.

28.     Late on Friday evening, Mr. OCHOA, gave a sperm sample. Defendants later brought him to Brackenridge Hospital for hair and blood samples to be taken.

29.     Rather than releasing him over the weekend between interrogations, defendants placed him in a room at the Holiday Inn on Town Lake and warned him not to leave or speak to anyone. Mr. OCHOA did not feel free to leave and followed orders. He stayed inside the hotel during the

entire weekend. Defendants told Mr. OCHOA that he was in danger from Mr. Danziger, who might try to harm Mr. OCHOA as a result of his "cooperation." Mr. OCHOA did not feel free to leave and followed orders. He stayed inside the hotel during the entire weekend.

30.    Mr. OCHOA was so distraught about the abuse he had received from the defendants that he telephoned his roommate, Roger Lewis, and asked him to come to the hotel. Mr. OCHOA told Mr. Lewis that he was in serious trouble and needed a lawyer.

31.    Early on Monday morning, November 14, 1988, defendant POLANCO picked Mr. OCHOA up at the hotel and transported him back to the APD Homicide Detail. POLANCO, irate, told Mr. OCHOA in sum and substance, "Now we know you're guilty. We know you called your roommate, and we know you asked for a lawyer."

32.    Over the day and a half of interrogation, defendants provided Mr. OCHOA with secret details of the crime as they understood it – including that the scene had been flooded, that a blue apron had been used to clog the sink in the ladies' bathroom, and that the murder weapon was a .22-caliber pistol – and then used shockingly coercive tactics to wrest a false confession from Mr. OCHOA based on information "only the perpetrator would know."

33.    As set forth in the Findings of Fact and Conclusions of Law by Judge Robert Perkins of the 331st District Court in Austin attached as Exhibit 1, defendants"fed" Mr. OCHOA additional non-public information that was consistent with their theory of the case, but that was in fact false, including without limitation, the following:

    a.  Consistent with the medical examiner's initial report, defendants told Mr. OCHOA that Ms. DePriest had been raped vaginally and sodomized anally. In fact, there was no sodomy.

b. Consistent with the "ligature marks" Emergency Medical Technicians had identified on Ms. DePriest's wrists and the fact that her brassiere was loose around her arms when her body was discovered, defendants told Mr. OCHOA that her hands had been bound behind her back with her brassiere. In fact, Marino had bound her hands with a pair of handcuffs, which he removed after the murder.

c. Defendants told Mr. OCHOA that the perpetrators had used a key to gain access to the Pizza Hut through an east-side door. In fact, it was impossible to use a key to enter the Pizza Hut's east-side door from the outside. That door could only be opened from the inside. Marino actually entered through the west-side door.

34. To induce Mr. OCHOA to "confess" to these "facts," defendants resorted to continuous threats of imminent physical harm, rape by inmates, and the death penalty by "needle," all in their campaign to force and shape a false confession that fit their understanding of the physical evidence in the case. Their abusive tactics included:

a. defendants displayed gruesome photographs of Nancy DePriest's naked and mutilated body from the crime scene and her autopsy to Mr. OCHOA and told him how they believed the murderer committed the crime;

b. POLANCO repeatedly told Mr. OCHOA that he was going to get "the needle" if he did not cooperate and taunted him with a photograph of a death-row cell;

c. Defendants further told Mr. OCHOA that Mr. Danziger was in the next room "fixing to talk" and that if Mr. OCHOA did not talk first, Mr. Danziger was going to talk. Mr. OCHOA understood this to mean that Mr. Danziger would be the one to be spared the death penalty for "cooperating" with the police;

9

d. BALAGIA told Mr. OCHOA, "I'm tired of you," picked up a chair and threw it at Mr. OCHOA. The chair flew over Mr. OCHOA's head and bounced off the wall. BALAGIA caught it just before it hit Mr. OCHOA in the head. Mr. OCHOA was terrified that the defendants would seriously injure him if he did not falsely "confess;"

e. POLANCO told Mr. OCHOA that he was "fresh meat," and that POLANCO was going to put him "downstairs" where other inmates were going to "have their way with him." Mr. OCHOA, never having been in prison before, feared imminent rape if he did not make a confession.

35. Although he was innocent, and told them so, Mr. OCHOA believed he would receive the death penalty if he did not comply with the defendants' demands that he falsely "confess" to being involved in the crimes with Mr. Danziger. No record was made of Mr. OCHOA's initial exculpatory statements.

36. Defendants' coercive tactics finally crushed Mr. OCHOA's will, and he signed two false statements written by defendants. The first stated that Mr. Danziger had confessed to Mr. OCHOA that he, Mr. Danziger, had alone committed the rape, robbery and murder. The second statement, also written by defendants, was more lengthy than the first, and "admitted" in lurid detail that Mr. OCHOA and Mr. Danziger had jointly participated in the robbery, rape and murder, but that Mr. Danziger had shot Nancy DePriest. In accord with the defendant's false understanding of the evidence, the second statement "confessed" that Mr. OCHOA and Mr. Danziger had entered the Pizza Hut with a key through the east-side doors; that Mr. OCHOA had tied her hands behind her back with her bra; and that both men raped her vaginally and anally.

37. In fact, Mr. OCHOA had no personal knowledge of any facts concerning the rape and

murder of Ms. DePriest, and no physical evidence tied him to the crimes.

38.     All of the operative facts of the crime contained in the statements signed by Mr. OCHOA were fabricated by the Austin Police Department officers questioning him, defendants POLANCO and BALAGIA. To elicit his fabricated "confessions," these officers supplied Mr. OCHOA with autopsy photos and details of the crime that only the perpetrator or police would know, and "corrected" Mr. OCHOA's own statements, which did not comport with defendants' flawed understanding of the evidence.

39.     APD Homicide Unit officers intermittently tape-recorded Mr. OCHOA's interrogation. Defendants stopped the tape periodically and, in bad faith, re-recorded to conceal and destroy obviously exculpatory statements by "correcting" "mistakes" in Mr. OCHOA's "confession." Unknown APD defendants acting in bad faith destroyed these tapes prior to Mr. Danziger's 1990 trial.

### The Arrest and Coerced Plea Agreement

40.     Based on Mr. OCHOA's compelled statements, defendants sought an arrest warrant for Mr. OCHOA on November 14, 1988. Although they knew that these "confessions" had been fabricated through two days of leading questions and coercive interrogation tactics, the defendants knowingly and intentionally, and with reckless disregard for the truth, presented these material falsehoods and omitted material exculpatory evidence. The truth, if disclosed, would have vitiated probable cause.

41.     Specifically, defendants represented in the arrest warrant affidavit the substance of the second statement compelled from Mr. OCHOA, to wit, that he and Mr. Danziger had planned to rob the Reinli Street Pizza Hut, that Mr. Danziger had a "blue steel semi-automatic pistol," that

11

Mr. OCHOA tied Ms. DePriest up, that both men sexually assaulted her, that Danziger shot her in the head, and that both men attempted to wash away evidence of the crime with water from the bathroom. (The affidavit and warrant defendants prepared are attached as Exhibit 4.)

42.     Defendants omitted all material information that would have vitiated probable cause, including without limitation that they had compelled Mr. OCHOA's statement and forced him to adopt their misstatements through coercive tactics involving, for example, leading questions, threats of rape by inmates, and "the needle;" that Mr. OCHOA had made exculpatory statements and learned details of the crime only through news reports and their own leading questions; and that they had destroyed clearly exculpatory evidence by taping over and eliminating recordings of Mr. OCHOA's statements.

43.     As a direct and proximate result of defendants' deliberate misrepresentations and material omissions, a Travis County Magistrate issued a warrant for Mr. OCHOA's arrest. He was charged with capital murder and booked into jail during the early morning hours of Tuesday, November 15, 1988.

44.     On Tuesday morning, Mr. OCHOA was brought to court for arraignment. No attorney had been appointed. The arraignment judge, concerned that Mr. OCHOA had not been provided with an attorney during two days of custodial interrogation on the capital murder charge, brought him into chambers, and made arrangements for an attorney to be appointed.

45.     In March 1989, Mr. OCHOA was subjected to a polygraph examination at the Travis County District Attorney's Office to test the veracity of his second compelled statement. When asked whether Mr. Danziger had been the shooter, Mr. OCHOA's answer of "yes" registered "deception."

46. Aware that evidence of the brutally coercive interrogations that had compelled his first two falsely inculpatory statements, as well as evidence of his own exculpatory statements, had been destroyed, Mr. OCHOA signed a third false statement. This time he "admitted" that, while both he and Mr. Danziger had been involved in the crime, Mr. OCHOA, not Mr. Danziger, had been the shooter.

47. Under the continuing threat of assault, rape and death, Mr. OCHOA agreed to plead guilty and serve a life sentence. Prosecutors offered the plea agreement only on the condition that Mr. OCHOA testify against Richard Danziger at trial, consistent with the third statement that Mr. OCHOA was compelled to sign.

### Fulfillment of the Coerced Plea Agreement: Judicial Proceedings

48. On May 5, 1989, before the Honorable Bob Perkins, in the 331st District Court for Travis County, Texas, Christopher Ochoa pled guilty to the first-degree felony murder of Nancy DePriest, pursuant to the plea agreement he entered in order to avoid the death penalty.

49. After being forced to testify against Richard Danziger pursuant to the coerced plea agreement and the ongoing threat of physical harm and death, Ochoa was sentenced to life in prison on March 6, 1990.

### Custom, Pattern and Practice Facts: Post-Conviction Revelations of Systemic Misconduct in the Homicide Unit of the Austin Police Department

50. This was not the first time defendants POLANCO and BOARDMAN had used these abusive tactics to coerce a false confession. Approximately one week earlier, defendants POLANCO and BOARDMAN had engaged in the same kind of misconduct with another pair of suspects in the DePriest murder, Steven Zell and John Colvin. Defendants filed an affidavit of

probable cause to secure a warrant for the arrest of Zell and Colvin based on Zell's "confession," which implicated Colvin and included information "only the police or perpetrator would know." Defendants later discovered that Mr. Colvin had been at work on the morning of Ms. DePriest's murder and had to release both men.

51.     In September 1992, the APD – under new leadership – suspended POLANCO for the same type of misconduct that pervaded APD's Homicide Unit and caused the unlawful arrest and conviction of Mr. OCHOA. For example, during the 1991 trial of Angel Flores and Ernest Perez for the murder of Travis County corrections officer William Redman, POLANCO falsely testified that he had not taken a written statement from any key witnesses in the case. In fact, POLANCO had coerced a false statement about the murder from John Salazar, an individual who was actually in police custody when Mr. Redman was murdered. POLANCO failed to disclose this exculpatory evidence to the prosecutors or the defendants in that case. The APD terminated POLANCO after he refused to accept a voluntary 30-day suspension for this misconduct.

52.     POLANCO, however, appealed the APD's decision in arbitration and argued that he should not be held responsible for the improper interrogation techniques and the resulting Constitutional violations in the Flores and Perez investigation and trial because the APD never provided training or supervision to the Homicide Unit. At least three APD Homicide Detectives, including Defendants POLANCO and BOARDMAN, testified under oath that APD did not supervise them or provide them any training on the proper interrogation of witnesses and suspects or their duty to disclose exculpatory evidence to prosecutors.

53.     For example, defendant BOARDMAN testified that in the four years he was a member of the homicide unit, not one Captain or Deputy Chief became involved in any homicide

14

investigation, with one exception — the investigation of the Nancy DePriest murder. (This testimony appears on page 605 of the transcript, an excerpt of which is attached hereto as Exhibit 5.)

54.     Then-Police Chief JAMES EVERETT tacitly (and, at times, openly) endorsed this policy of non-supervision. His deliberate indifference to the obvious consequences of the APD's failure to supervise is best described by BOARDMAN. When asked to describe the lack of support and supervision of the homicide unit by APD supervisors, BOARDMAN testified that "[Chief Everett] told me, point-blank, he didn't give a fuck about homicide. Q: Was that the language he used? A: That's the exact language he used...." (This testimony appears at pages 664-65 of Exhibit 5.)

55.     BOARDMAN testified that the APD completely failed to train him and other Homicide Unit Detectives in the interrogation of witnesses and suspects:

Q:     [W]hat training did you receive when you were transferred to the homicide detail by the training division of the Austin Police Department to fill you in on the exact procedures you're to follow in homicide investigations?

A:     Basically, I was greeted with a book of homicide SOPs and given a library-type book dealing with different types of death. And I was assigned to a senior partner, someone who had been there prior--longer--or whoever had been there longest, and, at the time, it was Sergeant Dusty Heskey. And I believe prior to my first murder case, which was a capital murder case, I had been to three death scenes, all natural deaths, before I had got to a murder. That's the sum total of my homicide training.

Q:     And what type of training or legal updates were you receiving from the Austin Police Department City Legal Office?

A:     None that I recall.

Q:     If the City Police Department--City Legal wasn't giving you information concerning how to handle statements, the new case law from the Supreme Court, Texas Courts on the new decisions being handed down, how were you supposed to understand how

Q: to do your job properly?

A: The way I'd always been trained, I guess, based on what supervisors told you, based on what your peers told you.

Q: So the –

A: Educate yourself.

Q: Your understanding of the position of the Austin Police Department was that in homicide investigations, which there's potential for the death sentence being imposed, your legal supervision and training in these issues … was limited to a seat-of-the-pants approach?

A: Pretty much. The whole time I was in CIB it was by the seat of my pants.

(Exhibit 5 at 618-19.)

56.     POLANCO stated that Lt. Alvin Shaw subscribed to Attorney General updates and "some new case law."  When asked how this information was distributed, POLANCO answered, "It was placed up on a bookshelf, and pretty much it was on your own.  But no specific training or anything."  (This testimony appears at page 866-67 of the transcript, an excerpt of which is attached hereto as Exhibit 6.)

57.     APD Homicide Detective Brent McDonald confirmed the utter lack of training in his sworn testimony:

Q: What training did you receive from the police department in order to situate you to be an effective homicide investigator?

A: … I don't recall any specific training. It was more or less you learn as you go along.

Q: Had you received any training from the police legal department in preparation of statements?

A: No, sir.

Q: Had you received any training from the police legal department on how to deal with

16

custodial interrogations and the Supreme Court rulings on those interrogations?

A: No, sir.

Q: Isn't it a fact that a mistake could be made during those types of interviews that could result in cases being overturned?

A: Yes, sir.

Q: And I understand what you're saying is that you received no official training form the police department in the initial period, in which you were assigned to homicide, from anyone higher up in the ranks of from the city legal department in order to accommodate your need to be trained in that area?

A: That's correct.

(This testimony appears at page 730-31 of the transcript, an excerpt of which is attached as Exhibit 7.)

58.     POLANCO filed a lawsuit against the City of Austin, claiming that the decision to fire him for presenting perjured testimony in the Flores and Perez trial (*i.e.* that he did not obtain a written confession from John Salazar) was a pretext for racial discrimination. The City contended that POLANCO possessed an "extraordinary memory" and that he surely would have remembered that he obtained a false confession from a suspect in the murder investigation of a police officer. POLANCO countered that false confessions were so commonplace at the APD that officers would not necessarily remember obtaining them.

59.     Officer Robert Martinez, the City of Austin's most decorated APD officer, testified that during his tenure in homicide, he had taken numerous false confessions. Sergeant Gary Fleming, who handled the internal affairs investigation of POLANCO, stated that he had obtained between twenty-five and thirty confessions that he later discovered were false. Other officers confirmed that they, too, had obtained false confessions.

60. This trove of sworn testimony by APD officers reveals a Homicide Unit with an utter lack of training and supervision, although the need for oversight was obvious. The supervisory and municipal defendants were on notice, yet deliberately failed to train, supervise, investigate, discipline, or to institute any remedial measures, and therefore invited rampant official misconduct. Coercive interrogations resulting in false confessions were the inevitable consequence of the supervisory defendants' choices. This official misconduct was so habitual that it became entrenched as the APD's unquestioned custom, policy and practice, and caused Mr. OCHOA to suffer unendurable injuries.

### The APD's Own Investigation Confirms that APD Officials Condoned Widespread Misconduct by its Homicide Detectives

61. On November 9, 1992, new Police Chief Elizabeth Watson, District Attorney Ronnie Earle, and Mayor Bruce Todd announced the formation of a Joint Task Force to investigate the very unconstitutional customs and practices that led to Mr. OCHOA's wrongful arrest, confession and conviction, and had persisted for years in the APD Homicide Unit. The Task Force was set up to investigate the very police misconduct that caused Mr. OCHOA's unlawful arrest and conviction: (a) Using improper methods to obtain confessions and statements; (b) Obtaining false and incorrect statements and confessions; and (c) Concealing evidence possibly favorable to the accused in violation of state and constitutional law.

62. At the joint press conference, District Attorney Earle admitted that "[u]nfortunately, this behavior is not the result of the work of just one person, or [a] small group of people; rather, it appears to arise from attitudes among some criminal investigators of 'anything goes' and 'the end justifies the means.'" Chief Watson told reporters, "it is shocking to me that there could be this

18

breach of ethics that I see. I cannot fathom it." A copy of a November 10, 1992 Austin *American-Statesman* article quoting these remarks is attached as Exhibit 8.

63.     After interviewing over 50 APD officers, reviewing anonymous questionnaires, and analyzing 90 homicide investigations between 1986 and 1992, the Task Force found systemic and widespread misconduct within the same APD Homicide Unit that caused Mr. OCHOA's wrongful arrest and conviction in 1988 and 1989, and made the following specific findings:

   a. Homicide investigators had used "questionable tactics" and "improper methods" in eliciting statements and confessions;

   b. "In at least two cases reviewed by this task force, Sr. Sgt. Hector Polanco participated in the investigation and did not write a report;"

   c. Homicide investigators repeatedly failed to file or even complete reports, and had a "prevalent" practice of failing to record initial witness statements in cases where the investigators believed later versions to be "truthful;"

   d. "In one case a combination of absent reports and incomplete reports leads anyone who reads the police report to the false conclusion that Sr. Sgt. Hector POLANCO had no contact with the suspect during the interrogation procedure;"

   e. "There exists within the Austin Police Department a serious lack of training for homicide investigators. Resources have not been allocated to adequately train investigators in proper interrogation techniques, their legal duties to disclose exculpatory information, or even the fundamentals of forensic evidence."

   f. "There also appears to have been a vacuum in the areas of leadership and supervision. It suspends belief that those in the chain of command above Sr. Sgt. Hector POLANCO did

19

not know what was going on in the homicide detail with regard to interrogation methods and incomplete report writing."

(A summary of the Report is attached as Exhibit 9.)

64. The Task Force's summary also provides a glimpse into other murder investigations where APD's Homicide Unit used the same illegal tactics that they employed in the investigation of Richard Danziger. For example, in the investigation of Richard Osaze-Ediae, homicide detectives:

    a. Pressured/coerced a material witness to implicate the suspect by threatening to take the witness' children away and place them with the Department of Human Services. The detectives failed to disclose this fact to the prosecution.

    b. Threatened to have the suspect, Mr. Osaze-Ediae, and his family deported if he did not confess to the murder. Again, this information was not disclosed in the detective's offense report.

65.    According to the Task Force Report, in the case of *Paul Vallejo v. State*, homicide detectives:

    a. Threatened to have a witness' parole revoked, his children taken away, and his wife arrested if he did not cooperate.

    b. Supplied the witness with all of the information contained in his statement.

66.    The Task Force further concluded that "when a witness gave several versions of the story before giving the (so called) truthful version, a record was not kept of the first versions. Judging from the responses returned to the task force, this practice was prevalent."

67. The Task Force Report makes four things painfully clear: (1) Between 1986 and 1992 the

APD Homicide Unit had a custom and policy of "feeding" nonpublic information to suspects, using abusive and coercive interrogation methods, and then concealing evidence favorable to the accused – misconduct that posed an obvious danger of producing false confessions and covering up official wrongdoing; (2) the policymakers and supervisors in both the APD and the City of Austin knew about these customs, policies and practices; (3) the APD failed adequately to train or supervise its homicide detectives on proper interrogation methods or their duties to disclose exculpatory evidence, although these constitutional obligations recurred in *every* homicide investigation; and (4) the same customs and policies that the Task Force found and condemned directly and proximately caused CHRISTOPHER OCHOA to falsely implicate himself and Mr. Danziger for a crime they did not commit, and to suffer twelve years of wrongful imprisonment.

68. Despite the Task Force Report, defendants took no action to reexamine the case against Mr. OCHOA, and he remained in prison, counting the days until what he believed was his only chance at freedom – the day he became eligible for parole.

### The Perpetrator Comes Forward

69. On or about February 5, 1996, motivated by a religious conversion while in prison on another charge, Achim Josef Marino wrote to APD authorities and the editor of the Austin *American-Statesman* confessing to his lone responsibility for the crimes against Nancy DePriest. (Marino's 1996 letter is attached as Exhibit 10.) Marino's admissions were immediately substantiated when authorities found evidence at his parents' home in El Paso, Texas, including the bank bag Marino took from the Pizza Hut where Ms. DePriest was working at the time of the crime, and the handcuffs used to bind her hands.

70. Although defendants had physical evidence and a volunteered confession identifying

21

Marino as the lone perpetrator, no DNA testing was conducted, no comparison was made between the handcuffs and the autopsy photos to corroborate Marino's confession.

71. Subsequent forensic testing of a shell casing found at the crime scene revealed that El Paso police had seized the murder weapon, a .22-caliber Ruger, from Marino when he was arrested on another charge in 1988. Although the Austin Police Department took custody of the weapon after Marino's 1996 confession, they failed to compare its tool markings with the shell casing to confirm it as the murder weapon until 2000.

72. After receiving no response to his 1996 letter, Achim Marino wrote a second letter on or about February 17, 1988. Mr. Marino addressed this letter not only to the Chief of APD, Elisabeth Watson, but also to the ACLU and then-Governor George Bush. (Marino's second letter is attached as Exhibit 11.) In that letter, Mr. Marino informed the recipients that he did not know if they had a legal duty to release Mr. OCHOA and Mr. Danziger from prison, but he believed that they had a moral duty to do so.

73. When a semen sample from the vaginal swab taken from Nancy DePriest was subjected to DNA testing by both the Texas Department of Public Safety Crime Laboratory and an independent laboratory, Forensic Science Associates of Richmond, California, the results not only conclusively exonerated both Mr. OCHOA and Mr. Danziger, but also conclusively inculpated Achim Josef Marino. (Exhibit 2.) Mitochondrial DNA testing on the pubic hair revealed that Marino, not Mr. Danziger, was its source.

74. Marino has never met either Mr. OCHOA or Mr. Danziger.

75. On February 6, 2001, a review team comprised of the then-Austin Police Chief, Austin Police Department officials, and Texas Rangers, issued a report of yet another investigation of

22

the APD Homicide Unit, this time exploring systemic misconduct by the defendants during their investigation of the DePriest homicide. The team found that the defendants had "supplied OCHOA with information about the circumstances of the crime and later allowed him to include this information in confessions;" employed "suggestive questioning," and that the investigation suffered from a "general lack of documentation" that made Mr. OCHOA's complaints of coercion "difficult to substantiate or refute" before DNA testing illuminated the truth. The team recommended that the Austin Police Department's Internal Affairs Division investigate the DePriest homicide investigation, and that the United State's Attorney's Office investigate the misconduct leading to Mr. OCHOA's "confessions." (A copy of that Report is attached as Exhibit 12.)

### Exoneration and Release

76. DNA testing of the forensic evidence excluded both Mr. OCHOA and Mr. Danziger, and Mr. Ochoa was released from custody on bond on or about January 16, 2001.

77. On or about April 24, 2001, the Honorable Bob Perkins of the Travis County District Court for the 331st District signed an order making findings of fact and conclusions of law in the petitions for habeas corpus brought by CHRISTOPHER OCHOA and Richard Danziger. In the Order, attached as Exhibit 1, Judge Perkins found that defendants POLANCO and BALAGIA had supplied Mr. OCHOA with details of the crime, coerced Mr. OCHOA's "confession" through threats of bodily harm and the death penalty, and tampered with, withheld, and destroyed evidence revealing their investigative misconduct, and that the facts "remove all doubt, not just a reasonable doubt, that Christopher Ochoa and Richard Danziger are actually innocent." Judge Perkins granted the writ.

78. On or about February 6, 2002, Judge Perkins formally dismissed the indictment against Mr.

OCHOA "for the reason of actual innocence to those charges in the indictment and for which he

was sentenced." (A copy of the Order is attached as Exhibit 3.)

## Notice of Claim

79.    Although notice is not required in this case, and the City of Austin had actual notice of

Mr. OCHOA's injuries and potential claims on March 24, 2002, within 45 days of Judge

Perkins's order, Mr. OCHOA formally provided the City with notice of his claim pursuant to

Article XII, § 3 of the Austin City Charter. (A copy of the notice of claim letter is attached as

Exhibit 14.) More than thirty days have elapsed since such service without payment of the

claims. In fact, the City of Austin has not made any offer of settlement and failed to contact Mr.

OCHOA, his family, or his attorneys about this claim despite knowing that he continues to suffer

immeasurably after emerging into a changed world twelve years after being imprisoned at age

twenty-two for a crime he did not commit.


## CLAIMS FOR RELIEF

### FEDERAL CAUSES OF ACTION

### COUNT I
**42 U.S.C. § 1983 FOURTH AND FOURTEENTH AMENDMENT VIOLATIONS:
FALSE ARREST, DELIBERATE FABRICATION AND MATERIAL OMISSIONS IN
THE ARREST WARRANT AFFIDAVIT (FRANKS V. DELAWARE CLAIM),
AND MALICIOUS PROSECUTION
AGAINST DEFENDANTS BOARDMAN, POLANCO, BALAGIA, AND JOHN DOES**

80. Mr. OCHOA hereby incorporates by reference all of the foregoing and further alleges as

follows:

81. Neither the coerced false "confession" of Mr. OCHOA nor the informant's tip about him provided probable cause to arrest him for the rape and murder of Nancy DePriest.

82. No other evidence giving rise to probable cause existed, and in fact Mr. OCHOA was innocent of any crime against Nancy DePriest.

83. Nonetheless, defendants BOARDMAN, POLANCO, BALAGIA & JOHN DOES, deliberately, with malice and reckless disregard for the truth, caused an arrest warrant to issue by filing an affidavit containing fabricated evidence and omitting material information that would have vitiated probable cause.

84. No warrant would have issued for the arrest of Mr. OCHOA if defendants had not falsified the affidavit, or if they had included the material information about their own misconduct and Mr. OCHOA's lack of knowledge of the crime.

85. Based upon the fraudulently obtained arrest warrant, defendants arrested Mr. OCHOA for a crime he did not commit, and caused a prosecution to commence against him by charging him with murder.

86. Defendants' acts in falsifying the arrest warrant affidavit, arresting Mr. OCHOA and commencing, initiating, procuring and/or causing his prosecution deprived him of his liberty without probable cause or due process of law for twelve years, two months and two days, in violation of his clearly established rights under the Fourth and Fourteenth Amendments, and caused him to sustain the additional physical, emotional and pecuniary damages described above.

## COUNT II
### 42 U.S.C. § 1983: FOURTEENTH AMENDMENT VIOLATION: FAILURE TO DISCLOSE EXCULPATORY AND IMPEACHMENT MATERIAL TO THE PROSECUTION; BAD-FAITH DESTRUCTION OF OBVIOUSLY EXCULPATORY EVIDENCE, FABRICATION OF EVIDENCE,

## AND FAILURE TO INVESTIGATE
## AGAINST DEFENDANTS BOARDMAN, POLANCO, BALAGIA, AND JOHN DOES

87.     Mr. OCHOA hereby incorporates by reference all of the foregoing and further alleges as follows:

88.     Defendants BOARDMAN, POLANCO, BALAGIA, and JOHN DOES intentionally destroyed and failed to document or disclose to the prosecutors material exculpatory and impeachment information including, without limitation, the following:

   a.  Mr. OCHOA had no knowledge of the crime other than published information;

   b.  Defendants "fed" Mr. OCHOA details of the crime, coerced him into "admitting" that he and Mr. Danziger had committed it, and then claimed that Mr. OCHOA had knowledge only the perpetrator or police would know;

   c.  Defendants in bad faith tampered with and destroyed tape recordings of the interrogations that would have provided evidence of their misconduct and exculpated Mr. OCHOA;

   d.  Defendants intentionally withheld these material facts from their affidavit in support of an arrest warrant;

   e.  Defendants had previously arrested two other suspects, "fed" one of them non-public information about the crime, coerced him into incriminating himself and his coworker, and used that false information to procure an arrest warrant on the grounds that the suspect had information only the perpetrator or police would know. In bad faith, defendants either suppressed or destroyed evidence of this misconduct.

89.     By failing to disclose this information, defendants violated the Fourteenth Amendment, as interpreted by <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), <u>California v. Trombetta</u>, 467 U.S. 479

26

(1984), and their pre-1988 progeny, which imposed a clear duty on the defendants not to destroy obviously exculpatory evidence, and rather to report all material exculpatory and impeachment information to prosecutors.

90.     In their zeal to make an arrest with reckless disregard to the innocence of their targets, including without limitation Mr. OCHOA, Mr. Danziger, and two prior arrestees, defendants fabricated evidence by supplying Mr. OCHOA with details of the crime and then coercing him into making statements that "only the police or the perpetrator would know."

91.     Defendants recklessly failed to investigate leads that would have led to Marino, and violated Mr. OCHOA's Fourteenth Amendment right to due process of law.

92.     Defendants' bad-faith destruction of, and intentional failure to disclose this information to the prosecutors deprived Mr. OCHOA of significant exculpatory and impeachment material that would have completely eviscerated the incriminating value of his statements.

93.     Defendants' intentional, reckless and bad-faith misconduct caused Mr. OCHOA to plead guilty and serve twelve years, two months and two days of incarceration for a crime he did not commit, and to suffer the additional physical, emotional and pecuniary damages described above.

## COUNT III
### 42 U.S.C. § 1983: FIFTH AND FOURTEENTH AMENDMENT VIOLATIONS: FIFTH AMENDMENT RIGHTS TO COUNSEL AND TO BE FREE FROM COMPELLED SELF-INCRIMINATION, AND FOURTEENTH AMENDMENT SUBSTANTIVE DUE PROCESS RIGHT TO BE FREE FROM COERCIVE POLICE CONDUCT THAT SHOCKS THE CONSCIENCE AGAINST DEFENDANTS BOARDMAN, POLANCO, BALAGIA, and JOHN DOES

94. Mr. OCHOA hereby incorporates by reference all of the foregoing and further alleges as follows:

95. Mr. OCHOA was in police custody from Friday, November 11, 1988 through Monday,

November 14, 1988, throughout his interrogation by defendants BOARDMAN, POLANCO, BALAGIA, and JOHN DOES.

96. Defendants' coercive interrogation compelled Mr. OCHOA to make false inculpatory statements that were used against him in the arrest warrant affidavit, the information used as a charging instrument, and at his guilty plea, in violation of his Fifth Amendment right to be free from compelled self-incrimination.

97. By failing to cease the interrogation when Mr. OCHOA asked for an attorney on Friday, November 11, 1988, defendants BOARDMAN, POLANCO, BALAGIA, and JOHN DOES violated Mr. OCHOA's clearly established right to counsel under the Fifth Amendment as set forth in Miranda v. Arizona, 384 U.S. 436 (1966) and Edwards v. Arizona, 451 U.S. 477 (1981).

98. Although defendants BOARDMAN, POLANCO and BALAGIA knew or should have known that Mr. OCHOA was not involved in the murder of Nancy DePriest, they employed leading questions to educate him about details of the crime, and threatened him with imminent bodily harm, rape by criminal inmates, and death by lethal injection in order to compel Mr. OCHOA to "confess," plead guilty, and testify to a crime he did not commit. These brutal and coercive acts shock the conscience, and violated Mr. OCHOA's clearly established constitutional right to substantive due process of law as guaranteed by the Fourteenth Amendment.

99. Defendants' acts caused Mr. OCHOA to be falsely arrested and imprisoned, to suffer extreme and ongoing mental anguish, to sign false compelled incriminating statements and a fraudulent plea agreement, to testify against Mr. Danziger, to serve twelve years, two months and two days for a crime he did not commit, and to suffer the additional physical, emotional and pecuniary damages described above.

28

## COUNT IV
## 42 U.S.C. § 1983: CIVIL CONSPIRACY
## TO VIOLATE CONSTITUTIONAL RIGHTS
## AGAINST ALL NAMED AND UNNAMED INDIVIDUAL DEFENDANTS

100.    Mr. OCHOA hereby incorporates by reference all of the foregoing and further alleges as follows:

101.    Although they knew or should have known that Mr. OCHOA had no involvement in the murder of Nancy DePriest, defendants, acting in concert under color of state law, conspired among themselves and reached a mutual understanding to coerce Mr. OCHOA into falsely confessing, to arrest him without probable cause, and to withhold, destroy and cover up their misconduct, all in violation of the rights guaranteed him under the First, Fourth, Fifth, Sixth and Fourteenth Amendments.

102.    Defendants' acts caused Mr. OCHOA to be falsely arrested and imprisoned, to "confess" to a crime he did not commit, to sign a fraudulent plea agreement under duress, to testify against Mr. Danziger, and to serve twelve years, two months and two days of incarceration for a crime he did not commit, as well as suffering the additional physical, emotional and pecuniary damages described above.

## COUNT V:
## 42 U.S.C. § 1985(2): CONSPIRACY

103.    Mr. OCHOA hereby incorporates by reference all of the foregoing and further alleges as follows:

104.    Defendants EVERETT, MILLS, POLANCO, BOARDMAN, BALAGIA and JOHN DOES 1 through 20 violated Mr. OCHOA's clearly established rights under 42 U.S.C. § 1985(2)

29

by conspiring to obstruct justice and deter him by force, intimidation, and/or threats from pursuing his constitutional right to go to trial and testify on his own behalf, and from testifying truthfully at Richard Danziger's trial.

105.    The actions described above were committed with deliberate indifference to Mr. OCHOA's clearly established rights under 42 U.S.C. § 1985(2), violated this statutory right, and caused Mr. OCHOA to be wrongfully imprisoned, to testify falsely against Richard Danziger, to endure twelve years, two months and two days of incarceration for a crime he did not commit, and to suffer all of the other damages set forth above.

**COUNT VI:**
**42 U.S.C. § 1983: SUPERVISORY LIABILITY**
**AGAINST DEFENDANTS EVERETT, MILLS, POLANCO, BOARDMAN**
**AND JOHN DOES, IN THEIR INDIVIDUAL CAPACITIES.**

106.    Mr. OCHOA hereby incorporates by reference all of the foregoing and further alleges as follows:

107.    The false arrest, false confession, illegal confinement, malicious prosecution, wrongful conviction, and wrongful imprisonment of CHRISTOPHER OCHOA were caused by the deliberate indifference and recklessness of defendants EVERETT, MILLS, POLANCO, BOARDMAN and other unnamed JOHN DOE defendants, in their individual capacities as supervisors in the Austin Police Department, when they failed adequately to train and supervise their employees and agents, including the other individual defendants in this case.

108.    Specifically, these supervisors failed to train and/or supervise these employees and other defendants, thereby encouraging and/or permitting these employees and other defendants to coerce false confessions and to withhold and destroy evidence of their misconduct, which caused

the constitutional deprivations suffered by Mr. OCHOA.

109.    These investigative and interrogation procedures were contrary to accepted methods used by law enforcement agencies.  The fact that the supervisory defendants failed to train and supervise their subordinates to ensure that police officers employed proper interrogation, investigation, and documentation procedures demonstrates deliberate indifference and reckless disregard for Mr. OCHOA's Constitutional rights.

110.    The supervisory defendants knew or should have known that POLANCO, BOARDMAN and BALAGIA engaged in unlawful investigative tactics based on their prior similar misconduct, including without limitation, their coercion, fraudulent obtaining of an arrest warrant and false arrests of the two other men arrested for the same crime approximately one week before Mr. OCHOA's arrest.

111.    The actions, omissions and personal involvement of the defendants EVERETT, MILLS, POLANCO, BOARDMAN and JOHN DOE supervisors proximately and directly caused the constitutional deprivations and grievous personal injuries suffered by Mr. OCHOA, including the above-mentioned injuries and damages.

**COUNT VII:**
**42 U.S.C. § 1983: SUPERVISORY LIABILITY - HIRING AND RETENTION AGAINST EVERETT AND JOHN DOE DEFENDANTS IN THEIR INDIVIDUAL CAPACITIES FOR CONSTITUTIONALLY IMPROPER HIRING AND RETENTION OF HOMICIDE DETECTIVES INCLUDING DEFENDANTS POLANCO, BOARDMAN AND BALAGIA.**

112.    Mr. OCHOA hereby incorporates by reference all of the foregoing and further alleges as follows:

113.    The false arrest, false confession, illegal confinement, malicious prosecution, wrongful

31

conviction, and wrongful imprisonment of CHRISTOPHER OCHOA were caused by the

deliberate indifference and recklessness of defendants EVERETT and JOHN DOE supervisors,

in hiring homicide detectives including defendants POLANCO, BOARDMAN and BALAGIA,

and retaining them as Austin Police Department Homicide officers despite their prior

misconduct, including without limitation, acts of coercing confessions from suspects,

fraudulently obtaining arrest warrants, and withholding and/or destroying exculpatory evidence

and impeachment material reflecting their own misconduct.

114.    The supervisory defendants knew or had notice of POLANCO, BOARDMAN and

BALAGIA's unlawful investigative tactics based on their prior similar misconduct, including

without limitation, their coercion, fraudulent obtaining of an arrest warrant and false arrests of

the two other men arrested for the same crime approximately one week before Mr. OCHOA's

arrest, yet failed to take any corrective action that would have averted Mr. OCHOA's ordeal.

115.    The actions, omissions and personal involvement of EVERETT and the JOHN DOE

supervisory defendants in improperly hiring and retaining defendants POLANCO, BOARDMAN

and BALAGIA proximately and directly caused the constitutional deprivations and grievous

personal injuries suffered by Mr. OCHOA, including his false arrest, false confession, coerced

guilty plea, and all other injuries and damages set forth above.


### COUNT VIII:
### 42 U.S.C. § 1983: MONELL CLAIM AGAINST THE CITY OF AUSTIN
### FOR FAILURE TO SUPERVISE AND TRAIN

116.    Mr. OCHOA hereby incorporates by reference all of the foregoing and further alleges as

follows:

117.    Upon information and belief, defendant CITY OF AUSTIN, by and through its

policymaker, then-Police Chief JAMES EVERETT, acting in his official capacity ("the

municipal defendants"), created and maintained an official custom, practice and/or policy of

failing adequately to train and supervise department employees and agents, including, without

limit, defendants POLANCO, BOARDMAN and BALAGIA regarding the existence of probable

cause to arrest, proper methods of taking and documenting interrogations, observing the

requirements of Miranda v. Arizona, Brady v. Maryland, California v. Trombetta, and/or

procuring confessions.

118.    The municipal defendants knew or had notice of POLANCO, BOARDMAN and

BALAGIA's unlawful investigative tactics based on their prior similar misconduct, including

without limitation, their coercion, fraudulent obtaining of an arrest warrant and false arrests of

the two other men arrested for the same crime approximately one week before Mr. OCHOA's

arrest, yet failed to take any corrective training or supervisory action that would have averted Mr.

OCHOA's ordeal.

119.    As a direct result of this unconstitutional custom, practice and/or policy of failing  to

adequately train or supervise police in constitutional methods of interrogation, documentation

and investigation, and as they had previously done against other criminal defendants, defendants

BOARDMAN, POLANCO and BALAGIA intentionally, maliciously and with reckless disregard

for and deliberate indifference to Plaintiffs' rights, coerced Mr. OCHOA into making falsely

incriminatory statements, entering into a plea agreement, testifying against Mr. Danziger at his

trial, admitting to and serving twelve years, two months and two days for a crime he did not

commit, and caused him to suffer all of the other injuries and damages set forth herein.

**COUNT IX:**
**42 U.S.C. § 1983: MONELL CLAIM AGAINST THE CITY OF AUSTIN**
**FOR UNCONSTITUTIONAL OFFICIAL POLICY**
**BY COMMON, WELL-SETTLED CUSTOM AND PRACTICE**

120.    Mr. OCHOA hereby incorporates by reference all of the foregoing and further alleges as follows:

121.    Upon information and belief, the CITY OF AUSTIN, by and through its then-Police Chief JAMES EVERETT, in his official policymaking capacity, created and maintained a custom, policy and/or practice within his office of arresting criminal defendants without probable cause, failing to observe proper methods of taking and documenting interrogations, ignoring the requirements of Miranda v. Arizona, Brady v. Maryland, California v. Trombetta, and/or procuring confessions from criminal defendants.

122.    These practices, even if not authorized by officially adopted or promulgated policy, were so common and well settled as to constitute a custom that fairly represented the Austin Police Department's official custom, practice or policy as of 1988.

123.    As a direct result of this official custom, practice, and/or policy, defendants BOARDMAN, POLANCO and BALAGIA intentionally, maliciously and with reckless disregard for and deliberate indifference to Mr. OCHOA's rights, falsely arrested Mr. OCHOA, failed to stop interrogating him once he asked for an attorney, coerced Mr. OCHOA into falsely incriminating himself, and withheld and/or destroyed evidence of their misconduct.

124.    As a direct result of this official custom, practice, and/or policy, Mr. OCHOA was compelled to make false self-incriminatory statements, to plead guilty, to testify against Mr. Danziger at trial, and to serve twelve years in prison for a crime he did not commit, in violation

of the rights guaranteed him under the First, Fourth, Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution.

125. This official custom, practice, and/or policy proximately and directly caused Mr. OCHOA grievous permanent injury, including, great distress, physical pain, anguish, fear, suffering, loss of companionship and monetary damages.

126. Current Austin Police Chief Stan Knee is liable in his official capacity as the successor in interest to policymaker Everett, for the damages caused by the CITY OF AUSTIN's unconstitutional policies, practices or customs as promulgated by Everett.

### COUNT X:
### 42 U.S.C. § 1983: MONELL CLAIM AGAINST THE CITY OF AUSTIN FOR UNCONSTITUTIONAL HIRING AND RETENTION OF HOMICIDE DETECTIVES INCLUDING DEFENDANTS POLANCO, BOARDMAN AND BALAGIA

127. Mr. OCHOA hereby incorporates by reference all of the foregoing and further alleges as follows:

128. The false arrest, false confession, illegal confinement, malicious prosecution, wrongful conviction, and wrongful imprisonment of CHRISTOPHER OCHOA were caused by the deliberate indifference and recklessness of defendants CITY OF AUSTIN, by and through its policymaker, JAMES EVERETT, in hiring defendants POLANCO, BOARDMAN and BALAGIA and, despite their prior misconduct, including without limitation, acts of coercing confessions from suspects and suppressing and/or destroying evidence of misconduct, retaining them as Austin Police Department officers.

129. The improper hiring and retention of defendants POLANCO, BOARDMAN and

BALAGIA took place pursuant to a longstanding policy, practice or custom by the CITY OF AUSTIN to hire law enforcement personnel without adequately screening them for the likelihood of misconduct, and, when made aware of instances of constitutional misconduct, to retain law enforcement personnel in reckless disregard for the likelihood that they will continue to violate criminal defendants' constitutional rights.

130.    The actions and omissions of the municipal defendants in improperly hiring and retaining defendants POLANCO, BOARDMAN and BALAGIA proximately and directly caused the constitutional deprivations and grievous personal injuries suffered by Mr. OCHOA, including his false arrest, false confession, coerced guilty plea, and all other injuries and damages set forth above.

131.    As the successor in office and liability to Police Chief EVERETT, current Austin Police Chief STAN KNEE, in his official capacity, is liable for the damages caused by the CITY OF AUSTIN's inadequate policy, practice or custom of hiring and retention, as promulgated by EVERETT.

## COUNT XI
## 42 U.S.C. § 1983: <u>MONELL</u> CLAIM AGAINST THE CITY OF AUSTIN
## AND POLICE CHIEF JAMES EVERETT
## FOR THE DIRECT UNCONSTITUTIONAL ACTION OF A POLICYMAKER

132.    Mr. OCHOA hereby incorporates by reference all of the foregoing and further alleges as

follows:

133.    Upon information and belief, defendant JAMES EVERETT knew about the systemic

misconduct by Homicide Detectives yet, as the Police Chief and final policymaker, he failed to

train, supervise or remediate.  In so doing, he created and maintained an unconstitutional official

custom, practice and/or policy with regard to the existence of probable cause to arrest, proper

methods of taking and documenting interrogations, observing the requirements of <u>Miranda v.</u>

<u>Arizona</u>, <u>Brady v. Maryland</u>, <u>California v. Trombetta</u>, procuring confessions, and/or rendering

perjured testimony.

134.    Defendant EVERETT knew or had notice of POLANCO, BOARDMAN and

BALAGIA's unlawful investigative tactics based on their prior similar misconduct, including

without limitation, their coercion, fraudulent obtaining of an arrest warrant and false arrests of

the two other men arrested for the same crime approximately one week before Mr. OCHOA's

arrest, yet failed to take any corrective training, supervisory or remediative action that would

have averted Mr. OCHOA's ordeal.

135.    As a direct result of defendant EVERETT's acts and omissions, which implicitly

authorized and encouraged misconduct, defendants BOARDMAN, POLANCO and BALAGIA

intentionally, maliciously and with reckless disregard for and deliberate indifference to Mr.

OCHOA's rights, coerced Mr. OCHOA into making falsely incriminatory statements, entering

into a plea agreement, testifying against Mr. Danziger at his trial, admitting to and serving twelve years, two months and two days for a crime he did not commit, and caused him to suffer all of the other injuries and damages set forth herein.

## STATE LAW CAUSES OF ACTION

### COUNT XII
### MALICIOUS PROSECUTION
### AGAINST DEFENDANTS POLANCO, BOARDMAN, BALAGIA
### AND JOHN DOES 1 THROUGH 20

136. Mr. OCHOA hereby incorporates by reference all of the foregoing and further alleges as follows:

137. A criminal prosecution was commenced against Mr. OCHOA.

138. Defendants POLANCO, BOARDMAN and JOHN DOES 1 through 20, acting in their individual capacities, initiated and/or procured the prosecution.

139. The prosecution terminated in Mr. OCHOA's favor on February 6, 2002 based on his actual innocence.

140. Defendants POLANCO, BOARDMAN and JOHN DOES 1 through 20 did not have probable cause for the proceedings and acted maliciously.

141. As a result of the malicious prosecution, Mr. OCHOA suffered severe damages.

### COUNT XIII
### FALSE IMPRISONMENT
### AGAINST DEFENDANTS POLANCO, BOARDMAN
### AND JOHN DOES 1 THROUGH 20

142. Mr. OCHOA hereby incorporates by reference all of the foregoing and further alleges as follows:

143.    Defendants POLANCO, BOARDMAN, and JOHN DOES, acting in their individual capacities, unlawfully arrested and detained Mr. OCHOA without his consent.

144.    Defendants POLANCO, BOARDMAN, and JOHN DOES 1 through 20 had no legal authority or justification to arrest or detain Richard.

145.    Defendants POLANCO, BOARDMAN and JOHN DOES John Does 1 through 20 proximately and directly caused Mr. OCHOA to suffer severe damages.

## COUNT XIV
## NEGLIGENT SUPERVISION
## AGAINST DEFENDANTS JAMES EVERETT, STAN KNEE
## AND JOHN DOES 1 THROUGH 20

146.    Mr. OCHOA hereby incorporates by reference all of the foregoing and further alleges as follows:

147.    Defendants JAMES EVERETT, STAN KNEE, and JOHN DOES 1 through 20, acting in their individual capacities, failed to take due care in supervising the investigative and interrogation practices of Homicide Detectives, including without limitation defendants POLANCO, BOARDMAN and BALAGIA.

148.    This failure to supervise directly and proximately caused Mr. OCHOA to suffer arrest without probable cause, to suffer the physical and emotional trauma of day-long abusive and coercive interrogations, to "confess" to a crime he did not commit, and to suffer twelve years, two months and two days of incarceration.

## COUNT XV
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## AGAINST DEFENDANTS POLANCO, BOARDMAN
## AND JOHN DOES 1 THROUGH 20

149.    Mr. OCHOA hereby incorporates by reference all of the foregoing and further alleges as

follows:

150.    Defendants POLANCO, BOARDMAN and JOHN DOES 1 through 20 acted or failed to act intentionally or recklessly.

151.    The conduct of Defendants POLANCO, BOARDMAN and JOHN DOES 1 through 20 was extreme and outrageous, and proximately and directly caused Mr. OCHOA to suffer severe emotional distress.

**COUNT XVI**
**CONSPIRACY**
**AGAINST DEFENDANTS POLANCO, BOARDMAN**
**AND JOHN DOES 1 THROUGH 20**

152.    Mr. OCHOA hereby incorporates by reference all of the foregoing and further alleges as follows:

153.    Defendants POLANCO, BOARDMAN and JOHN DOES 1 through 20 acted together to falsely arrest, force a false confession from, indict, prosecute, and wrongfully imprison Mr. OCHOA.

154.    Defendants POLANCO, BOARDMAN and JOHN DOES 1 through 20 came to a mutual understanding and/or meeting of the minds about the unlawful object of their conspiracy.

155.    Defendants POLANCO, BOARDMAN and JOHN DOES 1 through 20 committed numerous overt and unlawful acts, as set forth above, in order to further their conspiracy and wrongfully imprison Mr. OCHOA.

156.    The conduct of defendants POLANCO, BOARDMAN and JOHN DOES 1 through 20 proximately and directly caused Mr. OCHOA to suffer severe damages.

## CLAIM FOR DAMAGES

157.    The actions of Defendants, jointly and severally, deprived Mr. OCHOA of his civil rights

under the Fourth, Fifth, Sixth, and Fourteenth Amendment to the United States Constitution.

158.    As a direct and proximate result of defendants' acts, plaintiff Mr. OCHOA suffered

grievous permanent injury, great distress, pain, anguish, fear, suffering, loss of companionship

and monetary damages for which he is entitled to compensatory damages in the amount of

$20,000,000.

159.    Defendants' acts with respect to Mr. OCHOA were intentional, malicious, deliberate,

reckless, in bad faith, wanton and/or cruel such as to justify an award of punitive damages to Mr.

OCHOA in the amount of $50,000,000.


## PRAYER FOR RELIEF


WHEREFORE, Plaintiff requests that this Court:

   A.    Award compensatory damages to Mr. OCHOA and against the Defendants, jointly

         and severally, in the amount of $20,000,000;

   B.    Award punitive damages to Mr. OCHOA and against the Defendants, jointly and

         severally, in the amount of $50,000,000;

C.   Award and allow Plaintiffs costs and attorneys fees pursuant to 42 U.S.C. § 1988 or any other applicable law;

D.   Award and grant such other just relief as the Court deems proper.

Respectfully Submitted:

_____
William Allison, Esq.
1012 Rio Grande
Austin, Texas 78701
Tel. (512) 472-2664
Fax (512) 472-4102
SBN 01093000

Barry Scheck, Esq.
Nick Brustin, Esq.
Deborah L. Cornwall, Esq.
COCHRAN NEUFELD & SCHECK, LLP
99 Hudson St. - 8th Floor
New York, NY 10013

Attorneys for Plaintiff CHRISTOPHER OCHOA

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

NOTICE OF DOCUMENT(S) NOT IMAGED

Civil Case No.         A:02CA710-JN

Christopher Ochoa

VS.

City of Austin, et al.

Attachments to
Document #:           1

Description:          Verified Complaint and Jury Demand

Filed By:             Christopher Ochoa

File Date:            11/7/02